**In the Matter of BLURIDG FARMS, INC., Debtor.**

**Bankruptcy No. 87–251–C J.**

United States Bankruptcy Court,
S.D. Iowa.

Oct. 31, 1988.

Mark S. Lorence, Des Moines, Iowa, for debtor.

Steven H. Krohn, Council Bluffs, Iowa, for Bank.

Linda R. Reade, Asst. U.S. Atty., Des Moines, Iowa, for U.S.

Anita L. Shodeen, Chapter 12 Trustee, Des Moines, Iowa.

David L. Davitt, Des Moines, Iowa, for FLB.

### ORDER

LEE M. JACKWIG, Chief Judge.

On March 23, 1988 the following matters came on for hearing in Des Moines, Iowa: (1) confirmation of plan; (2) motion to mod-

ify stay filed by Okey–Vernon First National Bank (Bank); and (3) motion to dismiss filed by the Bank. Mark S. Lorence appeared on behalf of the debtor. Steven H. Krohn appeared on behalf of the Bank. David L. Davitt appeared on behalf of the Federal Land Bank (FLB), Anita L. Shodeen, standing Chapter 12 trustee appeared. The remaining unresolved disputes concern only the debtor and the Bank. The record in this case consists of the materials entered into evidence at the hearing, a transcript of the hearing and the parties' posthearing briefs. The court considers the matter fully submitted.

## FACTUAL BACKGROUND

The debtor filed a petition for relief under Chapter 12 on February 2, 1987. Its 920 acre farm is located in Adams County and is devoted primarily to growing row crops and feeding cattle.

On April 24, 1987 the Bank filed a proof of claim evidencing a claim of $504,152.19. This claim is secured by a mortgage interest in the debtor's real estate and a blanket security interest in the debtor's chattels. It is undisputed that the Bank's interest in the real estate has no value after considering the claims of superior mortgage holders. The parties stipulate that the value of the Bank's security interest in machinery and vehicles is $86,500.00. At the time of the hearing, the Bank admitted that the value of the machinery had not declined.

The debtor's operation has generated substantial income since the filing date. The record shows that this income consists of government program payments and proceeds from crops planted postpetition and from custom cattle feeding. This income is summarized as follows:

PIK certificate ........... $ 6,632.38
Grain .................... 76,795.00
Custom Feeding ......... 31,000.00

Total              $114,427.38

The parties agree this income is unencumbered. This income is not reflected in the debtor's liquidation analysis.

Under its plan, the debtor proposes to fix the Bank's allowed secured claim at $86,500.00. It amortizes the claim over 7 years at 10.75% for yearly payments of $18,208.60. The debtor plans to pay the first installment on the effective date of the plan and payments on January 15 of each successive year.

For the first year of the plan, the debtor proposes to plant approximately 290 acres of corn and 365 acres of beans. The debtor's grain income projections are based on a yield of 125 bu./a. for corn and 40–45 bu./a. for beans. The ASCS proven yield for the debtor's farm is 103 bu./a. for corn. Olin R. Goldsmith, Jr. president of the debtor stated that in 1987 the corn yield was 150 bu./a. Average yields for the debtor's farm from 1983 through 1986 are summarized below:

|  | Corn | Beans |
| --- | --- | --- |
| 1983 | 77 bu./a. | 36 bu./a. |
| 1984 | 105 bu./a. | 32 bu./a. |
| 1985 | 114 bu./a. | 42 bu./a. |
| 1986 | 120 bu./a. | 39 bu./a. |
| Average | 104 bu./a. | 39.25 bu./a. |

The record does not clearly indicate what prices the debtor anticipates receiving for its crop. The debtor plans to rent an additional 200 acres in 1989 and 1990. The debtor had not entered into a lease as of the hearing date.

With respect to custom cattle feeding the debtor does not plan to feed cattle until the fall of 1988. This will permit the debtor to market stored grain and apply the proceeds to debt repayment. The debtor expects to ultimately feed 500 cattle on a continual basis.

The debtor's cash flow does not provide an expense category for machinery replacement or for income taxes. The cash flows show a yearly machinery repair expense of $6,280.00. Repair expenses for past years are set out as follows:

| 1983 | $13,293.00 |
| --- | --- |
| 1984 | $9,295.00 |
| 1985 | $8,176.00 |
| 1986 | $13,049.63 |

Mr. Goldsmith stated that the reason the projected repair expense is lower than past actuals is that during years of high expenses the debtor had to repair or replace feed and cutter chains for silos. Mr. Gold-

smith testified that each cutter chain cost approximately $4,000.00.

The court notes that the cash flows reflect a yearly payment to the Bank based on a 5–year amortization whereas the body of the plan calls for a 7–year amortization. The debtor's cash flows are summarized as follows:

### 3/'88–2/'89

Income

| | |
|---|---|
| Crops | $167,132.00 |
| Custom Feeding | 90,160.00 |
| Farm Program Payments | 45,772.38 |
| Carryover | 35,000.00 |
| **Total** | **$338,064.38** |

Expenses

| | |
|---|---|
| Fertilizer | $ 0.00 |
| Hired Labor | 12,000.00 |
| Spray and Chemicals | 0.00 |
| Seed | 0.00 |
| Taxes | 5,189.00 |
| Insurance | 7,604.00 |
| Interest | 1,705.00 |
| Auto | 375.00 |
| Fuel | 6,737.00 |
| Machine or Custom Hire | 9,700.00 |
| Freight and Trucking | 0.00 |
| Machinery Repairs | 6,280.00 |
| Other Repairs | 800.00 |
| Utilities | 4,445.00 |
| Rent | 0.00 |
| Livestock | 0.00 |
| Purchased Feed | 7,400.00 |
| Purchased Feeder Stock | 0.00 |
| Drying | 852.00 |
| Corn Purchase for Feed | 0.00 |
| Family Living | 15,000.00 |
| **Total** | **$ 78,087.00** |
| Gross Profit | $259,977.38 |
| Debt Service | 217,726.00 |
| **Cash Position** | **$ 42,251.38** |

### 3/'89–2/'90

Income

| | |
|---|---|
| Crops | $118,880.00 |
| Custom Feeding | 128,150.00 |
| Farm Program Payments | 48,640.00 |
| Carryover | 42,251.38 |
| **Total** | **$337,921.38** |

Expenses

| | |
|---|---|
| Fertilizer | $ 17,250.00 |
| Hired Labor | 12,000.00 |
| Spray and Chemicals | 9,450.00 |
| Seed | 11,867.00 |
| Taxes | 10,378.00 |
| Insurance | 7,604.00 |

Expenses

| | |
|---|---|
| Interest | $ 0.00 |
| Auto | 375.00 |
| Fuel | 7,880.00 |
| Machine or Custom Hire | 11,700.00 |
| Freight and Trucking | 0.00 |
| Machinery Repairs | 8,135.00 |
| Other Repairs | 800.00 |
| Utilities | 4,445.00 |
| Rent | 22,400.00 |
| Livestock Expense | 0.00 |
| Purchased Feed | 14,800.00 |
| Purchased Feeder Stock | 0.00 |
| Drying | 3,050.00 |
| Family Living | 16,200.00 |
| **Total** | **$158,334.00** |
| Gross Profit | $179,587.38 |
| Debt Service | 92,794.32 |
| **Cash Position** | **$ 86,793.06** |

### 3/'90–2/'91

Income

| | |
|---|---|
| Crops | $118,880.00 |
| Leased Goods | 14,800.00 |
| Custom Feeding | 128,150.00 |
| Farm Program Payments | 48,640.00 |
| Carryover | 86,793.06 |
| **Total** | **$397,263.06** |

Expenses

| | |
|---|---|
| Fertilizer | $17,250.00 |
| Hired Labor | 12,000.00 |
| Spray and Chemicals | 9,450.00 |
| Seed | 11,867.00 |
| Taxes | 10,378.00 |
| Insurance | 7,604.00 |
| Interest | 0.00 |
| Auto | 375.00 |
| Fuel | 7,880.00 |
| Machinery or Custom Hire | 11,700.00 |
| Freight and Trucking | 0.00 |
| Machinery Repairs | 8,135.00 |
| Other Repairs | 800.00 |
| Utilities | 4,445.00 |
| Rent | 22,400.00 |
| Livestock Expense | 555.00 |
| Purchased Feed | 15,170.00 |
| Purchased Feeder Stock | 0.00 |
| Drying | 3,050.00 |
| Corn Purchase for Feed | 0.00 |
| Family Living | $16,200.00 |
| **Total** | **$159,259.00** |
| Gross Profit | $238,004.06 |
| Debt Service | 92,794.32 |
| | **$145,209.74** |

## DISCUSSION

### I.

■ The Bank first argues that the debtor's plan fails to satisfy the "best interest

of creditors test" found at 11 U.S.C. section 1225(a)(4). This provision states:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . . .

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date.

*Id.* The Bank equates "on such date" with "the effective date of the plan". The Bank argues that the postpetition assets acquired by the debtor would be available to unsecured creditors if a Chapter 7 liquidation were conducted on the effective date of the plan. The Bank concludes the "best interest of creditors test" is not met because the debtor did not include those proceeds in its liquidation analysis.

The debtor contends that "on such date" refers to the date the debtor filed its bankruptcy petition. It maintains that the Bank's interpretation would place debtors in a "no win" situation. The debtor describes a scenario where it will use its best efforts to generate postpetition income to make the plan feasible only to have its efforts be in vain as all such income will be paid to unsecured claimholders.

In the recent case of *In re Nielsen*, 86 B.R. 177 (Bankr.E.D.Mo.1988), the debtors did not include their unencumbered 1987 crop in the liquidation analysis. The unsecured creditors argued that the debtors failed to satisfy section 1225(a)(4) in that the 1987 proceeds would have been paid to them had the estate been liquidated under Chapter 7. The debtors maintained that their plan was based on use of the funds from the 1987 harvest and that it would be unfair to base a confirmation determination on the timing of the harvest.

The *Nielsen* court rejected the creditors' argument. In doing so the court first noted the appropriateness of looking to cases interpreting 11 U.S.C. section 1325(a)(4) given that this provision is identical to section 1225(a)(4). The court cited *Hollytex*

*Carpet Mills v. Tedford*, 691 F.2d 392 (8th Cir.1982), wherein the Eighth Circuit Court of Appeals held that "on such date" in section 1325(a)(4) meant the petition date, not the confirmation date. The circuit court principally relied upon *In re Statmore*, 22 B.R. 37 (Bankr.D.Neb.1982), wherein a bankruptcy court concluded that "on such date" referred to the effective date of the plan but not to the assets in existence as of the effective date. Consequently, the bankruptcy court in the *Nielsen* case concluded that "the liquidation value to be used when comparing the amount to be paid to allowed unsecured claims, either under the proposed plan or Chapter 7 liquidation is to be determined as of the date of the filing of the petition". *Nielsen* at 178–179.

In declining to follow the *Nielsen* analysis, this court notes at the outset that both the *Hollytex* decision and the *Statmore* opinion focused on postconfirmation modifications of Chapter 13 plans. In *Hollytex*, the debtor elected federal exemptions pursuant to 11 U.S.C. section 522(d) at the time the original plan was confirmed. On the date the third modification was filed, Arkansas opted out of the federal exemption scheme as permitted by 11 U.S.C. section 522(b)(1). Accordingly, the creditors objected to the continued use of the federal exemptions by the debtors. In affirming the district court which had overruled the creditor's objection, the per curiam circuit opinion observed that:

The court found that a debtor may exempt any property that is exempt under federal, state or local law on the date of filing of the petition. 11 U.S.C. § 522(b). The petition commences the case. 11 U.S.C. § 101(31). The fact that a modification was filed at a later date does not change the effective date of the plan for the purpose of electing exemptions.

. . . .

Appellant's claim that it would receive a greater payment under Chapter 7 is based on the erroneous assumption that the effective date of the plan is the date of the last modification.

*Hollytex* at 393. The *Hollytex* court included the following quote from the *Statmore* decision:

> The debtors point to 11 U.S.C. § 1325(a)(4) which provides that the court shall confirm a plan if:
>
> > ... the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title *on such date;*
>
> The issue before [the court] is to which date the statutory language "on such date" refers. The debtors argue that the statutory language refers to "the effective date of the plan" and that, as a result, the date of their proposed modification, which would take effect today rather than at some earlier point in time, is to be the measure for the amount to be paid to unsecured creditors.
>
> It is difficult to read the statutory language as referring to other than "the effective date of the plan." ...
>
> Historically, the date of the filing on the petition in bankruptcy has been the cleavage date in defining rights of the debtor and his creditors. Trustee's avoiding powers generally arise on that date and the debtor's rights in exempt property also are defined on that date.... Nothing in the legislative history suggests that this historical concept is expressly modified by the use of the statutory language now under consideration.

*Hollytex* at 393 (quoting *Statmore* at 38) (emphasis in the original). In the *Statmore* case, the debtors attempted to reduce the amount payable to unsecured creditors under the already confirmed plan from $6,000 to zero. The debtors contended that the assets to which unsecured creditors could have looked for recovery at the time of confirmation had changed and would be totally exempt under applicable law. Accordingly, the debtors argued that the unsecured creditors would receive nothing if, as of the modification, the estate were liquidated under Chapter 7.

This court is reluctant to place too much reliance on *Hollytex* and *Statmore* in resolving the section 1225(a)(4) issue in favor of the debtor, in part, due to two more recent decisions of the Eighth Circuit Court of Appeals. In *In re Lindberg*, 735 F.2d 1087 (1984), the Chapter 13 debtors designated a homestead exemption in their home in town rather than in their farm. However, while the Chapter 13 case was pending and before the case was converted to Chapter 7, the debtors moved to the farm. Upon conversion, the debtors filed an amended schedule changing their homestead exemption from the $20,000 they had in the town home to the $80,000 they had in the farm. The circuit court found that the date of conversion, not the date of the original petition, controlled the choice of exemptions. Among other things, the circuit court observed that 11 U.S.C. section 522(b)(2)(A), which allows a debtor to exempt property under federal, state or local law in effect on the petition date, and section 11 U.S.C. 348(a), which provides that conversion does not effect a change in that date, did not prohibit the exemption in the homestead. *Id.* at 1089.[1]

The *Lindberg* court pointed out that the date of conversion controlled what is property of the estate. It reasoned that to restrict exemption claims to the petition date would prohibit a debtor from exempting any property acquired postpetition and would result in the debtor losing exemptions upon any postpetition exchange. *Id.* at 1090.

In *Education Assistance Corp. v. Zellner*, 827 F.2d 1222 (8th Cir.1987), the circuit court found that the bankruptcy court's failure to include a $6,000 lump-sum postpetition payment from a retirement fund and subsequent transfer to an IRA account was harmless error under the facts of the case. The appellate court pointed

---

1. The *Lindberg* panel did not discuss *Hollytex.* Given that *Hollytex* dealt with a change in the applicable law whereas *Lindberg* dealt with a change in exemption claim under the same applicable law, the two decisions should not be construed as inconsistent.

out that the Chapter 13 estate includes property acquired during the pendency of the case pursuant to 11 U.S.C. sections 541 and 1306(a)(1). *Id.* at 1224. The court then set out the following quote from 5 *Collier on Bankruptcy* ¶ 1325.05[2][a]:

> The date of the valuation of the property to be distributed under the plan, as well as the date as of which the conceptualized chapter 7 liquidation is to have taken place, are one and the same; both relate to the effective date of the plan.... Of course, the effective date of the plan cannot be antecedent to the confirmation hearing at which the issues raised by section 1325(a)(4) are to be heard by the court.

*Zellner* at 1225. The circuit court concluded that the record did not establish that the plan distribution to unsecured creditors was less than what they would receive if the $6,000 had been taken into account in the best interest of creditors test. *Id.* at 1225.[2]

Unlike the fact patterns in *Hollytex* and *Statmore,* the present case does not entail a modification of a confirmed plan. Unlike the *Hollytex* case, this court is not analyzing any change in the applicable law. Rather, as in *Lindberg* and *Zellner,* the focus is on the property of the estate. It is this court's opinion that the *Zellner* case requires that the best interest of creditors test be based on property of the estate as of or close to the time of the confirmation hearing. *Cf. In re Robinson Ranch,* 75

B.R. 606 (Bankr.D.Mont.1987) (valuation should be as of or as close to the effective date of the plan as possible); *Matter of Milleson,* 83 B.R. 696 (Bankr.D.Neb.1988) ("effective date" for purposes of section 1225 is the date on which the Chapter 12 plan becomes binding on the debtor and the other parties in interest and, therefore, occurs on or after the date on which the confirmation order is entered).

To accept the debtor's argument that the petition date should control would ignore the ramifications of 11 U.S.C. section 1207 which is patterned after section 1306. Clearly, the postpetition income at issue was property of the estate at the time of the confirmation hearing. To allow the debtor to retain the property generated while the automatic stay was in effect and before the confirmation hearing was completed violates concepts of fairness and equity which prevade the Code. Adhering to the *Zellner* decision, the postpetition income is strictly an asset of the estate and, therefore, would not otherwise be subject to distribution as disposable income pursuant to 11 U.S.C. section 1225(b)(1)(B). *Zellner* at 1226. That is, the unsecured creditors would not be able to reach the amount in issue by arguing that, unless the debtor pays the unsecured claims in full, the debtor must submit three years of disposable income for plan payments. Clearly, section 1225(b)(1)(B) provides that the three year period commences with the date the first payment is due under the plan.[3]

---

**2.** The *Zellner* panel set forth its analysis in a footnote:

> If EAC were to receive a 71% pro rata share of the $6,000 (the same share as it is receiving under the Chapter 13 plan), it would amount to $4,260. The only way to accurately compare this amount with the amount to be received under the Chapter 13 plan is to take the present value of the series of future payments provided for in that plan. *In re Hardy,* 755 F.2d 75, 76–78 (6th Cir.1985). EAC would have to receive a 26.7% rate of return on $4,260 to equal the present value of the series of future payments provided for in the plan. EAC provided no evidence to the district court establishing an anticipated rate of return. It would be unreasonable to remand to the bankruptcy court upon nothing more than speculation that EAC might have been able to prove that it could earn such a rate of return

> on $4,260, particularly when common knowledge indicates that such a return is not possible. Moreover, our calculation leaves out of the equation the fact that some income tax would in all likelihood be due if the IRA were liquidated. This would further reduce the amount available to EAC. The figures were supplied by the findings of the bankruptcy court, and we have simply used them to perform mathematical calculations, which we may do without engaging in independent factfinding.

> *Id.* at 1225, n. 4.

**3.** Likewise, one of the effects of confirmation is that the property of the estate vests in the debtor. 11 U.S.C. § 1227(b). However, income generated postconfirmation would still be property of the estate until the case is closed, dismissed or converted to Chapter 7. 11 U.S.C. § 1207.

Parenthetically, the court observes that unencumbered nonexempt assets in existence at the time a petition is filed typically are utilized in the day to day operations of the business or are encumbered pursuant to 11 U.S.C. section 364 and presumably for reorganization purposes. To require debtors to pay unsecured creditors an amount based on what was in existence at the time the petition was filed rather than on what is in existence at the time of confirmation seemingly ignores the reorganization process and the delicate balance of rights and interests among the various parties. For example, to the extent the unsecured creditors are unable to prove that reorganization is unlikely and the case should be dismissed or that a motion to incur secured debt should be denied, they usually witness some erosion of any equity cushion prior to the confirmation hearing. Accordingly, it is not unreasonable for the unsecured creditors to expect to receive under a confirmed plan what would be available to them if the estate were liquidated as of the effective date of confirmation.[4]

Finally, it is important to note that section 1225(a)(4) does not require that the entire amount due unsecured creditors be paid as of the effective date of the plan. Rather, the designated amount may be stretched out in accordance with 11 U.S.C. section 1222(c) as long as the property to be distributed is discounted to present value. *In re Hansen,* 77 B.R. 722 (Bankr.D. N.D.1987). Indeed, a finding of feasibility is based on a presumption that the reorganized debtor will more likely than not meet projected positive cash flows so as to service its debt including the amount required by the best interest of creditors test. In the present case, the debtor's cash flows suggest that it may be able to service the amount required by section 1225(a)(4) over a time period consistent with section 1222(c).

## II.

■ The Bank objects to the 7-year amortization of its claim provided by the debtor's plan. Questions concerning term of repayment implicate 11 U.S.C. section 1222(b)(9) which states that a plan may "provide for payment of allowed secured claims consistent with section 1225(a)(5) of this title, over a period exceeding the period permitted under section 1222(c)". Section 1222(c) states that, with the exception of subsections 1222(b)(5) and (b)(9), a plan may not provide for payment beyond three years unless the court for cause approves a longer period up to five years. In *In re Janssen Charolais Ranch, Inc.,* 73 B.R. 125, 127 (Bankr.D.Mont.1987), the court explained the limits placed upon payment of secured debt in the Chapter 12 context:

The only time limits on payment of secured debt are those which are implied by the present value language of 1225(a)(5), and the feasibility test of 1225(a)(6). Under 1225(a)(5), the rights of the unconsenting secured creditor can be modified only if, among other things, the creditor retains its lien on the security and receives collateral with a present value not less than the amount of the secured claim.

In many Chapter 12 cases, this court has permitted debtors to pay claims secured by chattels over a period of seven years or less. A 7-year repayment term is reasonable in this case. Although the secured equipment is older, the record indicates

---

The automatic stay remains in effect until the discharge is entered upon completion of plan payments or a determination of hardship is made or until the case is closed or dismissed. 11 U.S.C. §§ 1228 and 362(c).

**4.** Just as the secured creditor is entitled to adequate protection against any loss in the actual value of its collateral while the automatic stay is in existence by virtue of 11 U.S.C. section 1205 prior to confirmation and by means of 11 U.S.C. section 1225(a)(5) as of confirmation, the unsecured creditors—frequently consisting mainly of undersecured creditors—are entitled to receive at least as much as they would if the case were liquidated on the effective date in accord with section 1225(a)(4) and, if the trustee or an unsecured creditor objects to confirmation, to as much as the debtor is able to pay during the postconfirmation predischarge period pursuant to section 1225(b)(1)(B). The automatic stay, like "time", means "money" in some form, shape or manner to the extent warranted by the facts and permitted by law.

that the debtor has maintained the machinery. Hence, there is no reason to expect that the equipment will depreciate at a pace that will leave the Bank unprotected.

### III.

The Bank maintains that it should not be required to release its mortgage on the real estate until the debtor completes making the plan payments on the Bank's allowed secured claim. The Bank admits that its liens on the real estate are valueless.

This court has held that lien avoidance pursuant to 11 U.S.C. section 522 is appropriate in Chapter 12 but that the actual avoidance is conditioned upon entry of the discharge. *Matter of Simmons*, 86 B.R. 160 (Bankr.S.D.Iowa 1988). *See also Matter of Hunerdosse*, 85 B.R. 999 (Bankr.S.D. Iowa 1988) (despite delay of actual lien avoidance until discharge, value of exempt property should be deducted from allowed secured claim). The same rationale would apply with respect to extinguishing a mortgage lien under 11 U.S.C. section 506(d) to the extent the lien is unsecured under section 506(a).

Parenthetically, the court observes that section 506(d) actions to extinguish mortgage liens typically are brought pursuant to Bankruptcy Rule 7001(2). However, given the ultimate and combined effect of 11 U.S.C. sections 1225, 1226 and 1228, either a plan term setting the value of the secured claim or a motion under section 506(a) and Bankruptcy Rules 3012 and 9014 appears to accomplish the same result in the context of a Chapter 12 case.

### IV.

The Bank next argues that it is entitled to relief from the automatic stay because the debtor has failed to provide adequate protection with respect to the machinery. Specifically, the Bank argues that since the debtor has used the machinery during the pendency of the case, adequate protection should take the form of a rental payment in the amount of $13,000.00 to $15,000.00 per crop year. The Bank bases its motion on 11 U.S.C. section 362(d)(1) which provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

. . . .

Adequate protection in Chapter 12 cases is governed by 11 U.S.C. section 1205 which states:

(a) Section 361 does not apply in a case under this chapter.

(b) In a case under this chapter, when adequate protection is required under section 362, 363, or 364 of this title of an interest of an equity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;

(3) paying to such entity for the use of farmland the reasonable rent customary in the community where the property is located, based upon the rental value, net income and earning capacity of the property; or

(4) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will adequately protect the value of property securing a claim or of such entity's ownership interest in property.

Adequate protection in Chapter 12 cases is designed to protect creditors against decreases in the value of collateral. *In re Rennich*, 70 B.R. 69, 71 (Bankr.D.S.D.1987). Creditors must show that value of the collateral decreased between the time of the filing and the confirmation. *In re Turner*, 82 B.R. 465, 468 (Bankr.W.D.Tenn.1988). Mere use of the collateral is insufficient to entitle a creditor to adequate protection. *Id.* 469.

At the time of the hearing, the Bank admitted that the value of the collateral had not declined despite the fact the debtor has used the machinery during the course of the case. Accordingly, the Bank is not entitled to adequate protection.

## V.

11 U.S.C. section 1225(a)(6) provides that a court shall confirm a plan if "the debtor will be able to make all payments under the plan and to comply with the plan." The Bank challenges the feasibility of the debtor's plan. In summary, the Bank argues that the cash flows are based on certain faulty projections and omit certain expenses and debt.

With respect to feasibility determinations, one court has stated that "[f]easibility is never certain, particularly in farm situations. It is an element of confirmation that is difficult to prove, equally difficult to decide.". *In re Kloberdanz*, 83 B.R. 767, 773 (Bankr.D.Colo.1988). The Eighth Circuit Court of Appeals has declared that the "feasibility test is firmly rooted in predictions based on objective fact". *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985). A feasibility finding does not hinge upon a showing that a successful farm reorganization is guaranteed. *In re Hansen*, 77 B.R. 722, 726 (Bankr.D.N.D.1987). Rather, a plan should be confirmed if "it appears reasonably probable that the farmer can pay the restructured secured debt, over a reasonable period of time, at a reasonable rate of interest, in light of farm prices and farm programs as of the date of confirmation." *In re Ahlers*, 794 F.2d 388, 392 (8th Cir.1986), *rev'd on other grounds sub. nom. Norwest Bank Worthington, et al. v.*

*Ahlers*, —— U.S. ——, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Projecting income and expenses in the farm context is not an exact science. *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir.1985). Labile markets, unpredictable weather and changes in government programs preclude precise forecasting. *In re Fursman Ranch*, 38 B.R. 907, 912 (Bankr.W.D.Mo.1984).

In this case, the debtor's yield predictions are very optimistic in light of past averages and the possible impact of this year's drought throughout much of the Southern District of Iowa. However, the concommitant rise in grain prices over the past few months might offset any failure to meet the projected yields.

With respect to the custom feeding projections, the court finds the debtor's predictions reasonable. Although the debtor was not feeding cattle at the time of the hearing, cattle feeding is an integral part of the debtor's operation. The means with which to feed cattle are in place. The debtor fed cattle in 1987. The debtor plans to feed cattle this fall. Finally, that the success of a custom feeding operation depends on market conditions which often fluctuate wildly does not negate otherwise reasonable projections. The role of market conditions in the agricultural economy is one reason farming is an inherently risky venture. If the court found that the debtor's plan was not feasible because the debtor's feeding operation is dependent on market conditions, few farm plans would ever be confirmed.

Debtor's cash flows do not account for machinery replacement costs and income tax obligations. Additionally, the debtor somewhat understates its repair projections. However, the debtors relatively large cash cushions should accommodate such additional expenses even after adjustments are made for the minimum payment to unsecured creditors in accordance with section 1225(a)(4).

The court will not make a final determination regarding feasibility until the debtor amends its plan to comport with this decision. Additionally, the debtor must submit

the price assumptions upon which its cash flow projections are based.

## VI.

 Finally, the Bank moves under 11 U.S.C. section 1208 to dismiss the case for cause. The Bank emphasizes the amount of time that has passed since the debtor filed its petition due to the debtor's failure to cure prior inadequacies in the original plan and its unsuccessful effort to consolidate this case with those of its principals. The Bank questions whether the debtor will ever be able to submit a confirmable plan.

The court finds no merit in the motion to dismiss. This case has presented complex factual and novel legal issues requiring court intervention and resolution on more than one occasion. The debtor was not responsible for any unreasonable delay as contemplated by section 1208(c)(1). Furthermore, as anticipated in the prior division of this decision, it is more likely than not that the debtors will be able to submit a feasible plan that comports with this opinion. Accordingly, the motion to dismiss will be denied.

## CONCLUSION AND ORDER

WHEREFORE, based on the foregoing discussion, the court finds that:

1. The debtor's plan does not satisfy the "best interest of creditors test" under 11 U.S.C. section 1225(a)(4);

2. The debtor's proposal to pay the Bank's claim over 7 years satisfies the requirements of 11 U.S.C. section 1225;

3. The Bank's valueless lien on the real estate is voidable upon discharge;

4. The Bank is not entitled to adequate protection on its claim;

5. A feasibility determination can not be made until the debtor amends its plan to account for the best interest of creditors test and provides the price assumptions upon which its cash flows are based; and

6. There has been no unreasonable delay by the debtor.

THEREFORE, IT IS HEREBY ORDERED that:

1. The debtor submit an amended plan that comports with this order by November 18, 1988;

2. The motion to modify stay is denied; and

3. The motion to dismiss is denied.