**In re Albert F. HANSEN and Dianna Hansen, d/b/a Hansen Land and Cattle Co., a farm partnership, Debtors.**

**Bankruptcy No. 87–05123.**

United States Bankruptcy Court, D. North Dakota.

Aug. 3, 1987.

As Modified Sept. 24, 1987.

Thomas Disselhorst, Bismarck, N.D., for debtors.

Richard Olson, Minot, N.D., for State Bank.

Phillip Armstrong, Minot, N.D., Trustee.

A. William Lucas, Bismarck, N.D., for Metropolitan Fed. Bank.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matters before the court are confirmation of the Debtors Amended Plan Under Chapter 12 (Amended Plan) filed by Albert and Dianna Hansen (Debtors), on July 13, 1987, and to consider a Motion For Relief From Stay filed by the State Bank of Towner (Bank) on April 17, 1985. The Debtors filed for Chapter 12 relief on February 6, 1987. On May 6, 1987, the Debtors' Chapter 12 plan was filed. The United States Trustee and the Bank both filed objections to the May 6 plan. A hearing on the May 6 plan and the relief from stay motion was held before the undersigned on June 30, 1987. At that time, the Debtors were given permission to file an amended plan to include values and interest rates as determined at the hearing, and to address other objections. Both matters were taken under advisement, to be considered in the context of the amended plan. The Bank and Metropolitan Federal have since filed numerous objections to the amended plan which will be set forth and addressed in the Conclusions of Law. Based upon the evidence at the June 30 hearing, and the record, the court believes the material facts to be as follows:

### Findings of Fact

The Debtors have a farm/ranch operation in western North Dakota. They own the surface and 90% of the mineral rights on approximately 1,040 acres of farm and ranch land. The value of the surface acres is $180,000.00, with the mineral acres being valued at approximately $93,600.00. The North Dakota State Land Department (Land Dept.) as of July 9, 1987, is owed $65,771.25 secured by a first mortgage on the Debtors' surface and mineral acres. The State Bank of Towner, as of June 30, 1987, is owed $215,501.25 secured by a second mortgage on the surface acres.

The Debtors' present livestock business consists of 100 cows and calves, approximately 45 yearlings, 6 bulls, and 30 horses, for a conservative total value of $86,250.00. The livestock along with the machinery and equipment valued at $65,810.00 are pledged to Metropolitan Federal as security for a debt as of June 30, 1987, of $36,514.76.

The security interest in machinery is subject to a superior interest in various pieces to John Deere to secure its claim as of June 30, 1987, in the amount of $6,819.17. Neither the value of the machinery or livestock has been contested, and the values appear reasonable to the court.

The Debtors were in Chapter 11 bankruptcy between April 23, 1985, and December 11, 1986. Various reasons, including formidable environmental conditions and attorney problems appear to have prevented the Debtors from obtaining confirmation of a Chapter 11 plan at that time.

It is not unusual for farm debtors in bankruptcy to blame their financial woes on weather conditions. Farmers, however, must expect adverse conditions from time to time. The very essence of average production figures contemplates some adverse years to offset the good years. The Debt-

ors, however, have been subjected to extreme weather and environmental problems, beyond what one would normally expect. Between a combination of grasshoppers, hail, and drought, the Debtors did not harvest a bushel of grain in 1984, 1985, and 1986. They collected insurance payments and put the grain crop up for hay. The drought also forced the Debtors to sell off some of their livestock. The drought conditions affecting the Debtors' area has apparently dissipated. Presently, the Debtors' grain crop is doing quite well, with adequate moisture.

The worldwide decline in oil prices, and a decline in oil production in the Debtors' area, has also negatively affected the Debtors' operation. The Debtors' mineral acres have been leased almost continuously since 1950. In 1981, the Debtors' entire mineral acres were leased for $350.00 per acre, or $327,600.00, with the Debtors receiving a one sixth royalty. In 1985, 240 acres were top leased for $250.00 per acre. Interest in the sale and leasing of mineral acres is presently on the upswing, as the price of oil is increasing. The Debtors propose to either lease the mineral acres for $100.00 per acre or if no better offer is received, to sell the mineral acres for $100.00 per acre by July 1, 1989.

The Debtors are presently soliciting bids from major oil companies.

The Debtors project 1987 and 1988 gross income as follows:

| Source of Income | 1987 | 1988 |
| --- | --- | --- |
| Government payments | $ 9,718.94 | $ 9,718.94 |
| Oats | $ 1,350.00 | $ 1,350.00 |
| Durum | $14,289.73 | $ 14,289.73 |
| Horses (12) | $ 1,800.00 | $ –0– |
| Feeder Pigs | $ 8,000.00 | $ 16,000.00 |
| Cull cows (10 head) | $ 5,000.00 | $ 5,000.00 |
| Yearlings (45 head 1987, 80 head thereafter) | $24,750.00 | $ 57,600.00 |
| Oil lease | $ 216.00 | $ 216.00 |
| Custom combining | $ 5,000.00 | $ 5,000.00 |
| ASCS conservation project | $ 3,500.00 | $ 3,500.00 |
| Dianna Hansen employment (net to ranch after deducting living expenses) | $ 3,000.00 | $ 3,000.00 |
| Total | $76,624.67 | $115,674.67 |

The Debtors were issued 40% of their government payments on December 30, 1986. However, these payments were used for 1987 operating expenses, and thus are properly included as 1987 income for purposes of the court's analysis. The Debtors propose to expand their livestock enterprise into hog production, at an initial investment of approximately $3,000.00. The Debtors have raised hogs previously and believe that their cattle facilities can be sufficiently modified with portable corrals and pens which they presently have to facilitate a 20 sow hog operation. The Debtors anticipate producing one litter of pigs per sow in 1987, at 10 pigs per litter, at $40.00 per pig, for total 1987 hog income of $8,000.00. 1988 production is expected to be double 1987. Twenty bred sows will be purchased for between $175 to $250 each. It appears to the court, at this time, that the $3,000.00 which the Debtors include on their expense projection for 1987 will fall somewhat short of the dollars needed to purchase 20 sows. However, the figure is within the ball park and the discrepancy in dollar values is not material. The Debtors also intend to generate $5,000.00 of income from custom combining each year. Albert Hansen has custom combined in the past, is very handy and familiar with equipment, and feels the income is reasonable. Lloyd Stewart, who is assisting the Debtors in a consulting arrangement, also feels that the projections for hog income and custom combining are reasonable. Dianna Hansen also generates gross income of $650.00 per month at an off farm job, with some of the funds going for her personal living expenses while away from home, and for repairing a mobile home located in the city where she presently works. The Debtors' daughter also assists in the operation, and apparently works quite extensively on the farm with her father.

Although no evidence was presented concerning future declines in government farm program payments, State Bank suggests in its brief that the law requires that a 1.03% decline will occur in the target price in 1988 as compared to 1987, and that an additional .97% decline will occur in 1989 as compared to 1988. Furthermore, State

Bank suggests that the proven yields formula will be reduced as of 1988. While it appears that these comments are accurate, the court does not consider a 1% decline in a target price to be material in terms of analyzing the Debtors' feasibility. This decline may well be offset by higher prices or added value to PIK certificates. Moreover, there is no evidence to suggest that the change in the proven yields formula will materially affect the Debtors. Thus, the court believes that the Debtors' projected income from grain production is also reasonable.

The Debtors' expenses of $36,892.00 for 1987, and $45,057.68 for 1988, also appear reasonable, based upon Albert Hansen's testimony. The Debtors' projections suggest that $39,732.67 will be available for debt service in 1987, $45,057.68 will be available in 1988, and $162,217.48 which includes $93,000.00 income from lease or sale of the mineral acres, would be available in 1989. Because this plan is not being confirmed as rapidly as the Debtors contemplate, the court is under the impression that the hog operation may not get geared up quite as rapidly as the Debtors have projected. However, a month or two delay in income from the hog operation should not negatively affect the Debtors' ability to reorganize.

The Debtors propose to pay the Land Department over twenty years at 8.5% interest, their current rate. The Debtors believe that this payment can be made against the Land Department's mortgage on the surface acres and not the mineral interests, thus reducing the value of the State Bank of Towner's second mortgage position on the surface acres only to $114,228.75. The Debtors propose to pay this amount over twenty years at 11.75% interest. The Debtors propose to treat the remaining $101,272.50 as an unsecured debt.

The Debtors propose to pay Metropolitan Federal's debt over seven years at 11.5% interest, the current rate. The Debtors propose selling 45 of the yearlings secured to Metropolitan Federal, on or before November 1, 1987, for $24,750.00, and project to sell 10 cull cows for $5,000.00 (7 have already been sold with the Debtors presently holding a jointly payable check). Metropolitan Federal's payment would be made out of the sale. Apparently $1,800.00 from sale of horses will be used to fund the Debtors' hog purchases.

Virtually all unsecured debt is proposed to be paid by sale of the mineral acres. Interest on the unsecured debt under the plan ceases on the date the plan was filed and does not accrue between the date of confirmation and the date mineral income is to be received on or before July 1, 1989.

### Conclusions of Law

A Chapter 12 plan of reorganization cannot be confirmed unless the requirements of section 1225 of the Bankruptcy Code are met. The State Bank and Metropolitan Federal both object to confirmation on the basis that the requirements of section 1225(a)(5) of the Bankruptcy Code are not being met. Section 1225(a)(5) requires that the holder of a secured claim either accept the plan, retain the lien securing their claim and retain the value, as of the effective date of the plan, of property to be distributed under the plan on account of the claim which is not less than the allowed amount of such claim, or the debtor surrenders the property securing the claim. 11 U.S.C. § 1225(a)(5).

State Bank submits that the full value of its security is not being preserved, as the Debtors propose to have the Land Department payments applied only against the surface rights secured to the Land Department, and not the mineral rights which are also secured to the Land Department. State Bank argues that section 13-01-04 and section 35-01-05 of the North Dakota Century Code would require, under state law, that the Debtors' assets be marshaled, and that under state law the Land Department would first be required to proceed against the mineral acres to satisfy the Debtors' indebtedness to it. The court is of the opinion that the Bank's position is accurate, and thus the Bank would essentially have a first mortgage position against the Debtors' surface rights in real estate valued at $180,000.00. Therefore,

instead of having an unsecured claim in the approximate amount of $101,000.00, the State Bank essentially has an unsecured claim in the approximate amount of $35,000.00.

■ Metropolitan Federal objects on the basis of section 1225(a)(5) and alleges that the plan fails to allow them to retain a valid security interest in all of their collateral, and to receive the present value of their claim. Metropolitan's objection is essentially that the Debtors propose under their plan to sell cull cows and offspring of their cows, on an annual basis, without all of the proceeds going to Metropolitan Federal. Technically, Metropolitan's objection is valid in that the plan does not specifically provide that the Debtors' present livestock herd will be maintained, although that is apparently what is contemplated under the plan. To the extent that the Debtors use proceeds from the Bank's collateral to purchase hogs, or other livestock, the plan should provide that Metropolitan Federal's security interest would continue to attach to livestock purchased with the proceeds of the sale of their collateral.

Obviously, if Debtors in the livestock business are required to use the entire proceeds of all of their livestock sold on an annual basis to be applied to the creditor holding the livestock as security, there would be no funds available to pay the Debtors' remaining creditors, operating expenses, or living expenses. So long as the Debtors intend to maintain the approximate herd levels it presently has, Metropolitan's interest will be adequately protected, and section 1225(a)(5) will be complied with. Moreover, the extensive over-secured position of Metropolitan Federal guarantees that Metropolitan Federal's claim will be protected in full.

■ Section 1225(a)(4) of the Code provides that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date". 11 U.S.C. § 1225(a)(4). Metropolitan Federal and the State Bank both object on the basis that this requirement is not being met. Metropolitan does not have standing to object on this basis, as they do not hold an unsecured claim. However, the State Bank does hold an unsecured claim, and their objection must be considered. The claims of all unsecured creditors would be paid in full, if the Debtors were liquidated in a Chapter 7 case today. Thus, the present value of unsecured creditors' claims must be protected if they are to be paid subsequent to plan confirmation. The unsecured creditors' claims in this case must be discounted over time in the same fashion that secured creditor payments are being discounted. By attempting to pay off the unsecured claims as late as July 1, 1989, without interest, the unsecured claim holders would not receive as much as they would if the Debtors were liquidated today. The State Bank also objects that the Debtors are violating section 1225(a)(4) by proposing to use money for capital improvements while unsecured claims are not being paid in full. If the unsecured claims will be discounted and paid in full, as this court suggests is required, then this objection will be without basis. Moreover the Chapter 12 trustee will monitor a confirmed plan and ascertain that excess disposable income goes to pay creditors.

■ Metropolitan Federal and the State Bank also object on the grounds that the plan is not feasible. The Eighth Circuit requires that feasibility be rooted in predictions based on objective facts, and that things which are to be done after confirmation can be done as a practical matter. *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985). However, as counsel are well aware, success of any business enterprise cannot be guaranteed, and a guaranteed success is not the standard upon which confirmation of Chapter 12 cases should be measured. A plan should be approved if "it appears reasonably probable that the farmer can pay the restructured secured debt, over a reasonable period of time, at a reasonable rate of interest, in the light of farm prices and farm programs as of the date of confirmation". *In re Ahlers*, 794

F.2d 388, 392 (8th Cir.1986). This court has indicated on prior occasions that the benefit of the doubt in Chapter 12 cases will be given to farmers, if it appears that a reasonable chance of meeting their payments as projected under a plan. The Debtors' projections in the instant case for income and expenses appear reasonable to the court, and do not appear to be mere speculation. Albert Hansen impresses the court as being knowledgeable in farm production, animal husbandry practices, mechanics and machinery repair, and in the oil and gas business. The court believes that the inclement weather conditions of prior years have been wholly outside the control of the Debtors, and that, assuming average weather conditions, the Debtors will be able to meet their income and expense projections. However, for the reasons previously stated, the Debtors' Chapter 12 plan as presently filed is not capable of confirmation. The State Bank does not have an unsecured claim in the amount of approximately $101,000.00. Nevertheless, because this unsecured claim is proposed to be paid in full by 1989, the State Bank is being prejudiced only because interest is not being paid on its unsecured claim over a period of time. Other unsecured claim holders are being prejudiced in a similar matter. The court believes that the Debtors, by restructuring their payments, should be able to provide for the deficiencies in their plan as set forth above, and have an amended plan before the court forthwith to be considered. The amended plan should be able to be considered without further testimony.

The principal problem with the Debtors' attempts to reorganize is that they are not willing to dispose of their mineral interests immediately, but hope to obtain income from these mineral interests within the next year or two. While the court can well understand the Debtors' reasons for attempting to do this, such an attempt may eventually prevent successful completion of a plan. The Debtors' mineral interests presently have a sale value of approximately $93,000.00. Yet, this mineral interest is a nonincome producing asset, as the Debtors are only receiving approximately $200.00 per year by virtue of their mineral leases. If these mineral interests were sold today, with $93,000.00 of claims being immediately paid, the Debtors would save interest expenses over the next two years in the approximate amount of $10,000.00 per year. However, when to sell or lease the mineral acres is an economic decision for the Debtors to make. The court believes that substantial income must be derived from the mineral acres at least on or before July 1, 1989. Meanwhile, if the Debtors do not receive mineral interest income until July 1, 1987, they must be able to generate enough cash flow to make payments under their plan during the interim. If payments under the plan during the interim are not made, the Chapter 12 trustee will likely move for dismissal, and the court will likely grant that motion to dismiss the Debtors' Chapter 12 case. At that point, the ball game is over. Thus, the court believes that the Debtors should consider selling at least a partial portion of their mineral interests within the near future, to generate cash flow, to pay off some claim holders, and stop interest from accruing. While this case has dragged on, the court does not believe any of the creditors have been prejudiced, as there are still sufficient assets within the estate to pay all creditors in full. In view of the state anti-deficiency statutes, the State Bank may be unable to recover anything more in a foreclosure action than the surface interest value of $180,000.00. State Bank's appraiser testified that the decline in land values has bottomed out. Thus, State Bank will likely recover more in a successful Chapter 12 than outside it. Perhaps it is time for the State Bank, Metropolitan Federal, the Land Department and the Debtors to sit down in good faith negotiations, and draft a plan satisfactory to all parties. Without cooperation, Chapter 12's become expensive propositions for all parties involved.

■ The State Bank also has filed a motion for relief from stay, on the basis of section 362(d)(2), alleging that the Debtors do not have an equity in the property, and that the property is not necessary to an effective reorganization. Clearly, the

Debtor does not have equity in the property mortgaged to the State Bank. However, the court believes that the property is necessary to an effective reorganization. The Debtors in this case have a reasonable prospect of achieving a successful reorganization. Thus, the Bank's motion for relief from stay is DENIED.

■ Although the Debtors have not filed a motion for use of cash collateral to use proceeds from the sale of horses and cull cows secured to Metropolitan Federal, to purchase hogs, the Debtors contemplated doing so under the plan. The success of the Debtors' Chapter 12 case is dependent in part upon generating income from a hog operation. The Debtors should have the flexibility to proceed with this venture as quickly as possible. Thus, the Debtors are entitled to use cash collateral generated from proceeds of the horses, and cull cows, to the extent needed to buy hogs for their hog operation insofar as this amount does not exceed $3,500.00, providing that Metropolitan Federal be given a lien in the hogs acquired.

Accordingly, and for the reasons stated herein, the Debtors' amended plan under Chapter 12, as presently filed, is not capable of confirmation, but the Debtors are allowed to expeditiously file with the court, and circulate to creditors for objection, a further amended plan consistent with this court's order. IT IS FURTHER ORDERED that the State Bank of Towner's motion for relief from stay is DENIED. IT IS FURTHER ORDERED that the Debtors be entitled to use proceeds from the sale of horses and cull cows secured to Metropolitan Federal not to exceed the sum of $3,500.00, to purchase hogs for their hog operation, providing that Metropolitan Federal be granted a security interest in the acquired hogs.