**In re Kent P. STALLINGS and Tonya B. Stallings, Debtors.**

**No. 02–40751.**

United States Bankruptcy Court, D. Idaho.

March 24, 2003.

Brent T. Robinson, Rupert, Idaho, Attorney for Debtors.

Jerry V. Jensen, Buhl, Idaho, Attorney for Ag Services of America, Inc., and Ag Acceptance Corporation.

Forrest Hymas, Jerome, Idaho, Chapter 12 Trustee.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Introduction.

Debtors Kent and Tonya Stallings filed a petition for Chapter 11 relief on April 23,

2002. Docket No. 1. On Debtors' motion, the Court ordered the case converted to a Chapter 12 case on July 5, 2002. Docket No. 33.

Debtors filed their first proposed Chapter 12 plan on August 6, 2002. Docket No. 39. Confirmation of that plan was denied by the Court at a hearing held on September 10, 2002. Docket No. 48. Debtors filed an amended plan on October 11, 2002. Docket No. 51. The Court denied confirmation of this plan at a hearing on November 20, 2002. Docket No. 59.

Debtors filed their Second Amended Plan on December 16, 2002, and a Supplement to that plan on December 30, 2002. Docket Nos. 63 and 67. On January 10, 2003, the Court conducted an evidentiary hearing to consider confirmation of the Second Amended Chapter 12 plan and Supplement. At the hearing, it appeared all outstanding objections to the plan, save one, had been resolved. Creditor Ag Services of America, Inc./Ag Acceptance Corporation ("Creditor")[1] contests confirmation. Docket No. 69. After submission of evidence and testimony, the Court took the issues under advisement. Debtors and Creditor each submitted written post-hearing briefs. Docket Nos. 74 and 76. In addition, the Chapter 12 Trustee, Forrest Hymas, filed a written recommendation concerning confirmation of the plan. Docket No. 75.

Having now considered the record, applicable law, arguments of the parties, and recommendations of the Trustee, the Court makes the following findings of fact and conclusions of law. Fed. R. Bankr.P. 7052; 9014.

---

1. The extent of any difference in the interests or status of these two creditors in this case remains unclear to the Court from the record. Therefore, as counsel for the parties have done, the Court will refer to these creditors collectively.

## II. Facts.

Most of the material facts are not in dispute.

Debtors are farmers. They grow grain and sugar beets in the Magic Valley of Idaho. In the past, Debtors borrowed money from Creditor to finance their operations. Debtors granted Creditor a lien and security interest in most of their assets to secure Creditor's loans.

In 2000 and 2001, Debtors suffered significant reductions in their sugar beet crop because, according to Debtors, ashes and soil containing an herbicide called "OUST," a chemical which had been sprayed by the U.S. Bureau of Land Management ("BLM") on lands near their farm properties in 2000, blew onto their ground and contaminated their crops. Debtors sought relief in this Court under Chapter 11 in the spring of 2001 (Case No. 01–40345). However, they were able to negotiate an arrangement with their creditors to operate during 2001, so that bankruptcy case was voluntarily dismissed on May 7, 2001. When Debtors were unable to pay their debts again in the spring of 2002, they filed the present bankruptcy case.

The Court authorized Debtors' to use significant amounts of cash collateral in which Creditor claimed an interest so they could farm during 2002. As noted above, Debtors have proposed, but have been unable to confirm, two previous plans during the course of this case. Creditor has objected to confirmation of all the proposed plans, including the one now before the Court for consideration.

## III. Disposition of Issues.

Three issues remain between Debtors and Creditor. First, the parties disagree as to the extent of Creditor's allowed secured claim in this case. Second, Creditor objects to the treatment proposed by Debtors' plan for its secured claim. Finally, Debtors and Creditor differ as to whether Debtors' plan is feasible. These issues will be discussed in turn, along with additional relevant facts, below.

### 1. The Extent of Creditor's Allowed Secured Claim.

Two questions are raised concerning the extent of Creditor's secured claim. The parties dispute whether Creditor's security interest is enforceable against a certain government program payment received by Debtors during the course of this case in the amount of approximately $326,000.[2] After resolving this dispute, the Court must then attempt to fix the total amount of Creditor's allowed secured claim per 11 U.S.C. § 506(a).

### A. The Disaster Payment.

■ The parties provided the Court few helpful facts concerning the nature of the government program payment in question. From the record, however, the Court understands that in 2002, after Debtors filed this bankruptcy case, Congress appropriated some $5 million "for reimbursement for crop damage resulting from the [BLM's] use of herbicides [OUST] in the State of Idaho." Creditor's Exhs. D, E. During the pendency of this bankruptcy case, Debtors applied to the Department of Agriculture to share in these funds, based upon their estimated crop losses as a result of the chemical damages. In late 2002, Debtors received a payment of $326,000 from the government. In other words, while the $326,000 clearly represents a reimbursement to Debtors for a prepetition crop

---

2. In this Decision, the Court will utilize approximate dollar amounts. This is, admittedly, for the Court's and parties' convenience. In no instance where approximations are used does the Court feel any significant rights are impacted.

loss, both the establishment of the program under which the money was made available to eligible farmers, and the payment to Debtors, occurred after the date of Debtors' bankruptcy filing. *See* Notice, 67 Fed.Reg. 49667 (July 31, 2002) (announcing the 2001 Idaho Oust Program and the procedures for making a claim). Creditor argues this payment constitutes security for the balance due on its claims against Debtors, which totals about $880,000. Debtors contend that the government payment does not constitute property of the bankruptcy estate and they dispute that Creditor has a lien in this payment. The money, with the consent of the parties, has been delivered to the Trustee who holds it in trust pending further order of the Court.

Section 541(a)(1) provides that a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 552(a) dictates that, subject to an important exception, "property acquired by the [bankruptcy] estate or by the debtor after the commencement of the case is not subject to any lien resulting from a security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Section 552(b), the exception referred to above, specifies that if a security interest arising under a prebankruptcy security agreement "extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case ...." 11 U.S.C. § 552(b)(1).

Some courts have held, through what this Court regards as persuasive analysis, that a prepetition security interest in a

farmer's crops is effective as to federal disaster program benefits established, and corresponding payments made to the farmer, after bankruptcy. *See, e.g., Farm-Pro Servs., Inc. v. Brown*, 276 B.R. 620, 623–24 (D.N.D.2002). This Court reached the same conclusion on similar facts in *In re Lemos*, 243 B.R. 96, 101 (Bankr.D.Idaho 1999). Since the Court's decision in *Lemos*, however, the legal landscape has changed markedly. In *Sliney v. Battley (In re Schmitz)*, 270 F.3d 1254 (9th Cir. 2001), the Ninth Circuit examined government regulations that gave fishing quota rights to fishermen as part of a fishery management plan aimed at limiting the quantity of specific kinds of fish that could be taken from Alaskan waters during certain seasons. In that case, a bankruptcy trustee sought to deny the fisherman a discharge because the fisherman had sold his quota rights, but refused to turn over the proceeds to the bankruptcy estate. Because the regulations under which the quotas were given did not exist when the debtor filed his Chapter 7 petition, the court held the bankruptcy estate could not reach the proceeds from the sale of the quota rights, which were created under the government program after bankruptcy, even though those rights were premised in part on the debtor's catch levels during prepetition fishing seasons. Therefore, said the court, the debtor was entitled to a discharge. *Id.* at 1258–59.

While fishing quotas were under review in *Schmitz*, in reaching its decision, the Ninth Circuit relied upon a ruling from the Eighth Circuit Bankruptcy Appellate Panel to buttress its conclusion, *In re Vote*, 261 B.R. 439 (8th Cir. BAP 2001). *Schmitz*, 270 F.3d at 1257–58. Significantly, *Vote* examined a bankruptcy estate's right to payments under a federal farm disaster payment program, which paid qualified farmers, including the debtor, compensation for crop losses due to ad-

verse weather conditions. *Vote*, 261 B.R. at 440–41. Because on the date of Vote's bankruptcy, the federal program did not exist, the panel determined that at most, debtor held an "expectation" that payments may later be available to him. *Id.* at 443–44. Even though the adoption of a wide variety of disaster and benefit programs annually is common-place in agriculture, the *Vote* panel concluded that the expectation that such a program might be established in the future to cover a debtor's losses did not rise to the level necessary to constitute a "legal or equitable interest" in property. *Id.* Therefore, any subsequent payments made to the debtor under such a program did not constitute property of his bankruptcy estate. *Id.* at 444. The B.A.P. decision in *Vote* was affirmed by the Eighth Circuit Court of Appeals in *In re Vote*, 276 F.3d 1024 (8th Cir.2002), for the same reasons advanced by the B.A.P. Coming full circle, the Eighth Circuit opinion cites *Schmitz* for support. *Vote*, 276 F.3d at 1027.

In this case, the record is scant, but it appears that while the legislation appropriating the funds for the federal disaster payment program for Idaho farmers was passed by Congress sometime in early 2002, Creditor's Exhs. D, E, the existence and availability of the "Idaho OUST Program" was not announced by the USDA until June 14, 2002, and the period for enrolling for that program did not commence until July 15, 2002. Debtors' Exh.

7. While the Court would have appreciated better quality evidence concerning when this particular farm program was "established," based on this record, the Court concludes, as required by *Schmitz*, that the payment made to Debtors under this disaster program is not property of the bankruptcy estate.[3]

Recall, the logic upon which *Schmitz* is based presumes that Debtors had no legal or equitable interest in the right to receive the disaster payment at the time they filed their bankruptcy petition. As a result, Creditor's argument that its security interest is nonetheless enforceable against the OUST payment because its prebankruptcy security agreement covers Debtors' crops, general intangibles and payments under all kinds of government programs is untenable in light of the legal effect of § 552(a).[4] As noted above, that provision of the Code renders any prepetition security interest unenforceable as to property acquired by the estate or the debtor after commencement of the bankruptcy case. Even assuming Creditor's security agreement was broad enough to cover the disaster payment absent bankruptcy, Creditor's floating lien on such after-acquired property was scuttled by Debtors' bankruptcy filing.

■ Creditor also argues it can enforce its security interest as to the disaster payment because that payment constitutes "proceeds" of Debtors' prepetition crops

---

3. Although the dates differ somewhat from those proffered by the parties, this conclusion is supported by the Court's own research into the OUST program. *See* Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2002, Pub.L. No. 107–76, § 757, 115 Stat. 704, 740–41 (2001) (approved Nov. 28, 2001); Notice, 67 Fed.Reg. 49667 (July 31, 2002) (initiating the Idaho OUST program and explaining the application process).

4. The Court assumes for purposes of this discussion Creditor's security agreement contains the broad language quoted by counsel in Creditor's post-hearing brief. *See* Memorandum in Opposition to Confirmation at 3, Docket No. 72. While the documents containing these provisions were apparently attached to Creditor's proof of claim filed in this case, that proof of claim was not made a part of the evidentiary record at the confirmation hearing.

for purposes of the savings provision found in § 552(b)(1). However, if the authority discussed above is to have meaning, the Court is compelled to disagree with Creditor.

■ "It must be emphasized that subsection (b)(1) [to § 552] creates an exception for proceeds, product, offspring or profits generated by prepetition collateral, and not for 'after-acquired' property obtained by the debtor or the estate postpetition." 5 Lawrence P. King, *Collier on Bankruptcy* ¶ 552.02[1], 552–7 (15th ed. rev.2000). The OUST payment is not something Debtors acquired, or became entitled to acquire, upon or in exchange for the sale or disposition of their 2000 or 2001 crops. *See Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (explaining property interests, including security interests, should be defined by state law and analyzed the same inside and outside of the bankruptcy con-

text); *Fin. Sec. Assurance, Inc. v. Days California Riverside Ltd. P'ship (In re Days California Riverside Ltd. P'ship),* 27 F.3d 374, 376 (9th Cir.1994) (turning to state law to define proceeds under § 552(b)); *In re Ladd,* 106 B.R. 174, 176–77 (Bankr.C.D.Ill.1989) (holding government disaster payments were not proceeds of a crop under the UCC). And again, while Creditor's argument was persuasive enough to at one time convince this Court to agree, binding Ninth Circuit authority dictates that Debtors had no legal or equitable right to the government payment at the time they filed for bankruptcy.[5] In effect, the government payment to Debtors was intended by Congress to partially reimburse them for crops *not* produced because of the OUST problem. Seen this way, the disaster payment cannot be characterized as the "proceeds" of Debtor's prepetition crops.[6]

**5.** This Court so much as adopted Creditor's argument in its decision in *Lemos,* 243 B.R. 96 (Bankr.D.Idaho 1999). There, the Court held that a postpetition disaster payment constituted "proceeds" of a debtor's property interest existing on the date of bankruptcy, and as a result, the payment was also property of the estate under § 541(a)(6). Other courts adopted a similar analysis. *See, e.g., In re Boyett,* 250 B.R. 817, 822 (Bankr.S.D.Ga. 2000); *In re Ring,* 160 B.R. 692, 692 (M.D.Ga.1993). However, the Ninth Circuit has effectively rejected that analysis in *Schmitz,* discussed *supra.* Both § 541(a)(6) and § 552(b)(1) apply to "proceeds, product, offspring, and profits." *Schmitz* impliedly disapproved of the idea that a postpetition government payment could be "proceeds" of a debtor's prepetition property, and therefore, be included in the debtor's bankruptcy estate. To be true to *Schmitz,* the Court must construe § 552(b)(1) such that a postpetition disaster payment cannot constitute "proceeds" of some other prebankruptcy property of the debtor.

**6.** There appear to be two approaches to defining "proceeds" for purposes of § 552(b). One references the definition of that term

under the UCC; the other employs a broader definition based on the legislative history of § 552. *See Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.),* 907 F.2d 1430, 1437 (4th Cir.1990). The Court concludes that either approach, the OUST payment here would not constitute proceeds under § 552(b). The legislative history of § 552 instructs that "[t]he term 'proceeds' ... covers any property into which property subject to the security interest is converted." H.R.Rep. No. 95–595, at 377 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6333. Here, Debtors' beet crop was not "converted" into something else. While the record is less than clear, the OUST payment appears to be reimbursement for a crop that never existed. On this record, the Court is unwilling to conclude the payment fits the definition of proceeds based upon the Code's legislative history. Moreover, since *Schmitz* requires a finding that the OUST payment is not property of the estate, and the legislative history dictates that § 552(b) was intended to apply only to property that the debtor had at the commencement of the case, the payment can not constitute proceeds. *Id.* at 376–77; 1978 U.S.C.C.A.N. at 6332–33.

■ For the same reason, the lien granted Creditor by the Court's cash collateral order entered in this case on May 30, 2002, will not reach the unanticipated government payment. In that order, in consideration of allowing Debtors to use Creditor's cash collateral to operate during 2003, the Court authorized a new, postpetition lien in favor of Creditor to secure the amount of the cash collateral used by Debtors. However, that lien covers Debtors' "postpetition crops and crop proceeds." Order Authorizing Use of Cash Collateral at 2, Docket No. 20. Again, the government payment is clearly not something Debtors received in exchange for, or upon disposition of, Debtors' 2002 crops, and so cannot be seen as proceeds of 2002 crops. The cash collateral lien does not cover the government payment.

In short, the Court concludes that the OUST payment is not property of Debtors' bankruptcy estate, and that Creditor's prepetition security interest is not enforceable as to that payment.

## B. The Amount of Creditor's Allowed Secured Claim.

11 U.S.C. § 506(a) provides that a creditor's claim is deemed an allowed secured claim in a bankruptcy case "to the extent of the value of such creditor's interest in the estate's interest in such property . . . ." The balance of a creditor's claim that is not an allowed secured claim under this definition constitutes an unsecured claim. *Id.* If the value of the collateral securing a creditor's claim exceeds the amount owed on the debt, the creditor may also recover any interest, as provided by the parties' agreement, accruing after the bankruptcy case was commenced. 11 U.S.C. § 506(b).

Creditor claims a lien in Debtors' pre- and postpetition crops and crop proceeds, equipment, and other assets. Debtors' plan [7] sets the amount of Creditor's allowed secured claim at $350,000, after credit for a postpetition payment made by Debtors to Creditor of $150,000, and after credit for the proposed tender to Creditor of the "July 2001" beet proceeds payment of about $14,000, and the "final beet payment" of about $45,000. As indicated above, Creditor contends it is owed about $880,000, after credit for the $150,000 payment, which sum includes about $93,000 in postpetition interest. Since Creditor's position was that it held a lien in the $326,000 postpetition government OUST disaster payment (an argument the Court has disapproved above), and given Creditor's estimates of the values of Debtors' other assets, Creditor contends its claim is fully secured so that its claim must be paid in

---

As for the UCC approach, there is at a split of authority as to whether payments of the type at issue here are "proceeds." *See* Boyd J. Peterson, Annotation, *Secured Transactions: Government Agricultural Program Payments as "Proceeds" of Agricultural Products Under UCC § 9–306,* 79 A.L.R.4th 903, 1990 WL 675347 (1990). Even in light of the expanded definition of "proceeds" under Idaho's Revised Article 9, *see, e.g.,* Idaho Code 28–9–102(64), it is too much of an interpretive stretch to view the OUST payment, which can be seen as a "gift" from the government to effected farmers, as falling within the UCC definition of proceeds.

7. Debtors' proposed treatment of Creditor's claim was set forth in its Second Amended Plan, Article III.C, p. 7–11, Docket No. 63. However, that treatment was modified and in the Court's opinion, superceded by provisions contained in Debtors' Supplement filed December 30, 2002, p. 1–4, Docket No. 67. Under § 1223(a), a debtor may modify a proposed Chapter 12 plan at any time before confirmation, and upon so doing, "the plan as modified becomes the plan." 11 U.S.C. § 1223(b). The Court therefore deems Debtors' treatment of Creditor's claim in the Supplement their proposed "plan" for purposes of this Decision, and will refer to the Supplement as such.

full. Therefore, the Court must catalogue and value Debtors' various assets securing Creditor's claim to determine the extent of its secured claim.

Turning first to the value of Debtors' equipment, the parties stipulated at the hearing that the gross value of all the machinery was $ 110,000. However, John Deere Credit evidently holds a purchase money security interest with priority over Creditor's lien as to some items of equipment to secure a balance due of about $26,000. In addition, Farm Service Agency also evidently holds a lien with priority over Creditor's lien to secure the balance due to it that is not otherwise secured by its lien on Debtors' land. According to Debtors, FSA's lien on the equipment will amount to $34,500. The Court accepts Debtors' figures. Therefore, the value of Debtors' equipment that will secure Creditor's lien is about $49,500.

The bulk of Creditor's collateral consists of crops and crop proceeds. Since Debtors receive payments for their crops over time, they have received and hold proceeds from both 2001 and 2002 crops. In addition, Debtors have some unsold 2002 crops. The Court authorized a priority lien for fertilizer and seed vendors in Debtors' crops grown in 2002. The Court understands the amount due these vendors for goods and services supplied last season is about $110,000. In addition, the Court authorized Debtors to operate, and over the course of the year, Debtors have made expenditures from these cash crop proceeds amounting to about $342,000. Along with the OUST payments, Debtors also received other farm program benefit payments, which they do not dispute are subject to Creditor's lien. In addition to using some of the crop proceeds to operate during 2002, Debtors paid Creditor $150,000. As noted above, Debtors are also offering to surrender the remaining 2001 beet payments to Creditor.

So what is the value of crops and other cash subject to Creditor's lien? While the Court has made a considerable effort to decipher the record, in the final analysis, the Court is unable to quantify that amount which should be remaining on hand for allocation to Creditor's allowed secured claim. It is the burden of the parties to prove these amounts; it is not for the Court to "guess." Estimating the market value of the unsold crops should not be difficult. The amount of money both received and properly expended by Debtors during 2002, and the amount remaining on hand, should also be subject to ready determination. However, the accountings submitted into evidence by both parties in an attempt to outline Debtors' transactions in their crop proceeds and cash, and to value Creditor's secured interest, were, frankly, so confusing as to be of little value to the Court. Therefore, the Court cannot fix the amount of Creditor's allowed secured claim on this record.

There are issues the Court can resolve in arriving at a final number, however. For example, of the beet proceeds received by Debtors, a small portion of those monies represent payments made by the co-op to Debtors on behalf of their minor daughter, Tiffany, for crops she evidently raised on a portion of Debtors' ground. While it may seem odd that a child would be engaged in farming for profit, evidently Tiffany undertook the effort for educational and practical experience. She also apparently had a separate written contract with the beet co-op on the small number of acres of beets she raised. However, the record is devoid of information regarding how the cost of growing those beets was to be allocated between parents and child.

While it is an unusual scenario, the Court is sufficiently persuaded that Debt-

ors held, at most, a beneficial interest in any payments for "Tiffany's beets," and that to the extent those payments can be clearly identified as relating to Tiffany's beet contract, they should be excluded from the reach of Creditor's security interest. The Court understands from the record that this would amount to about $13,000 in proceeds. If Debtors bore any of the expense of raising those crops, to get the benefit of a truly educational experience, Tiffany should be required to reimburse Debtors. However, the amount of any reimbursement would not likely be subject to Creditor's lien.

Next, Creditor holds a lien in several of Debtors' assets as to which there has not been an adequate showing of value so as to determine equity for calculating Creditor's allowed secured claim. For example, Creditor apparently holds a second priority mortgage on Debtor's real property. However, because of the amounts owed to FSA, the first mortgage holder, there appears to be no equity to secure Creditor's mortgage.

In the same vein, Creditor holds a lien or security interest in claims asserted by Debtors against both the federal government and the manufacturer of OUST. Debtors have retained counsel and filed notice of their tort claims against the government. No further additional substantive information was given to the Court about this claim. Debtors also have asserted a claim under a multi-peril insurance policy they owned concerning the

crop loss, which claim Debtors allege has already been "assigned" to Creditor. On the basis of this thin record, the Court is unwilling to ascribe any significant value to these potential claims for recovery for purposes of valuing Creditor's secured claim.

In summary, then, while the Court can address the value of Creditor's lien as to Debtors' equipment, because of a failure of the proof, the Court is regrettably unable to fix the amount of Creditor's secured claim as to Debtors' remaining crops and crop income.

### 2. The Plan Treatment of Creditor's Claim.

■ On account of its allowed secured claim, Debtors propose to turn over certain beet payments to Creditor, and to pay Creditor about $201,000 from the OUST government disaster payment. In addition to these payments, Debtors also propose to pay Creditor $350,000 with interest, in deferred payments over six years commencing in March 2004.[8] Until the secured claim is paid as proposed, the plan provides that Creditor "shall retain its mortgage and lien rights in accordance with the terms of the existing loan documents except as modified herein." Supplement at 1, Docket No. 67.

Of course, whether payment to Creditor of what amounts to, all told, about $611,000 on its secured claim is adequate cannot be determined without fixing the amount of that secured claim.[9] This, as explained

---

**8.** Debtors also propose that Creditor retain any sums it recovers from the multi-peril insurance policy claim, and that Creditor retain two-thirds of any amounts Debtors recover on their claims against the BLM and the chemical manufacturer for OUST damages. Since, as noted previously in this Decision, there is inadequate evidence in the record to show that these claims against third-parties have any real value, Debtors' treatment of Credi-

tor's interest in these claims is not objectionable.

**9.** Debtors' plan must propose to distribute to Creditor property (*i.e.,* deferred cash payments in this case) of a value, as of the effective date of the plan, that is not less than the amount of Creditor's allowed secured claim. In other words, if Creditor's allowed secured claim, after receipt of the 2001 beet

above, the Court is unable to do on this record. Again, however, there are issues concerning treatment of Creditor's allowed secured claim that can be addressed at this time.

Creditor objects to its treatment under the plan because, among other things, the plan fails to abide by the requirements of § 1225(a)(5)(B)(i). Under that statute, in the absence of a secured creditor's acceptance of a plan or the debtor's surrender of the collateral to the creditor, in order to be confirmed, the plan must provide that the secured creditor "retain the lien securing such claim . . ." while the debtor completes any deferred payments on account of the claim. 11 U.S.C. § 1225(a)(5)(B)(i). In this case, Creditor points out that, except for a small amount of equity in Debtors' equipment and in some unsold crops, Creditor's claim is secured almost entirely by its interest in the cash proceeds from Debtors' crop sales. Because Debtors propose to use the cash to operate this year, Creditor argues the plan, as a matter of law, violates the "retain the lien" requirements of the Code.

Debtors' plan provisions concerning Creditor's lien rights are vague at best. The Supplement recites that Creditor shall retain its prepetition contractual mortgage and lien rights. This is probably adequate to protect Creditor's on-going interest in Debtors' land, equipment, and unsold crops and any existing crop proceeds. In this regard, the plan adequately provides that Creditor shall "retain the lien" it holds in this case.

However, the plan is unclear concerning what sort of new or continuing lien rights Creditor will enjoy on any assets or property acquired after the plan is confirmed. The Court suspects Debtors intended that Creditor would benefit from not only from any existing collateral for its claim, but also that Creditor would have a security interest in Debtors' future crops and proceeds to protect payment of its secured claim. If the Court's assumption is correct, the plan is deficient in not clearly specifying that relief. As currently written, while Creditor has a lien on existing property, it is questionable whether it will have a lien on after-acquired property. Since Debtors propose to spend the money they now have to operate during this and succeeding years, Creditor is rightfully upset that its lien rights will be diminished to such an extent that it will undoubtedly not be protected under the plan as to the $350,000 balance owed on its secured claim.

However, even assuming Debtors are proposing to grant Creditor a continuing, revolving security interest in their crops and crop income to secure payment of its secured claim, does Debtors' intent to use Creditor's existing cash collateral in the process violate § 1225(a)(5)(B)(i)? In other words, can a Chapter 12 debtor propose in a plan to use a secured creditor's cash collateral by providing that creditor with a replacement lien on other assets?

Clearly, Chapter 12 debtors can be allowed preconfirmation access to a secured creditor's cash collateral, provided the creditor receives an appropriate replacement lien or other "adequate protection" of its interests. 11 U.S.C. § 363(c)(2), (e). The Code does not precisely define "adequate protection," but instead provides a nonexclusive list of what sorts of relief can serve to adequately protect a creditor's interests where the debtor seeks to use cash collateral. 11 U.S.C. § 1205(b)(1)-(4). In particular, adequate protection for a debtor's use of cash collateral in Chapter

---

payments as proposed by Debtors' plan, is less than $350,000, Debtors' treatment of

Creditor's secured claim will satisfy § 1225(a)(5)(B)(ii).

12 can consist of, either alone or in concert with other measures, providing the secured creditor "an additional or replacement lien to the extent that such . . . use [of cash collateral] . . . results in a decrease in the value of property securing a claim . . . ." 11 U.S.C. § 1205(b)(2). Courts have held that, under the proper facts, it is appropriate to allow a debtor the use of cash collateral upon condition the secured creditor be granted a lien on the crops to be produced through such use. *See In re Brandon*, 93 B.R. 1002, 1002–03 (Bankr.D.Idaho 1988); *In re Pretzer*, 91 B.R. 428, 429–30 (Bankr.N.D.Ohio 1988); *In re Westcamp*, 78 B.R. 834, 836–39 (Bankr.S.D.Ohio 1987). Here, however, Debtors are not proposing to use cash collateral by granting the creditor a replacement lien pending confirmation of a plan under the authority of § 363(e) and § 1205. Instead, Debtors are proposing to use Creditor's cash collateral as a part of their confirmed plan. The issue is whether this approach satisfies the treatment of a secured creditor's claim as to the confirmation requirements in § 1225.

The leading treatise on bankruptcy law suggests that Debtors' intended use of the crop proceeds in which Creditor holds a lien, without Creditor's consent, as part of their plan, violates the confirmation standards of the Code. In discussing "cram down" of a secured creditor's claim in a Chapter 12 plan under § 1225(a)(5)(B), the authors opine that:

> It is probably impossible to satisfy [the "retain the lien" requirement of the Code], however, when the collateral involved are crops or accounts receivable or other property that must be disposed of quickly and cannot be retained by the debtor. If the claim is secured by crops or accounts receivable, the plan will usually have to provide for the property to be liquidated and the proceeds paid to the creditor or for the property to be surrendered to the secured creditor. Such a claim is not readily susceptible to cramdown.

8 Lawrence P. King, *Collier on Bankruptcy* ¶ 1225.03[4][a], 1225–16 (15th ed. rev. 2000). The authors observed that § 1129(b)(2)(A)(iii), the cram down provision applicable to secured claims under Chapter 11 plans, is "more liberal" concerning the debtor's use of cash collateral after plan confirmation, but they discern that even in Chapter 11, " 'soft' collateral such as crops or accounts receivable is not generally susceptible to a cramdown." *Id.* at n. 10.

One court has declined to give the "retain the lien" requirements of § 1225(a)(5)(B)(i) a literal reading. *Abbott Bank–Thedford v. Hanna (In re Hanna)*, 912 F.2d 945 (8th Cir.1990). In *Hanna*, debtors owned a livestock operation. They proposed through their Chapter 12 plan to pay the bank's secured claim over time, and provided for the bank to retain a lien on their livestock and other assets. *Id.* at 947. The debtors proposed to use the income from the sale of livestock, which was subject to the bank's prebankruptcy security interest, to fund their operations and make payments to creditors. *Id.* To protect the bank, the debtors offered to give the bank a second mortgage on their land. The bankruptcy court found that the security provided to the bank by the debtors in the plan adequately protected its allowed secured claim, and over the bank's objection, confirmed the plan. *Id.*

Affirming the bankruptcy court's ruling, the Eighth Circuit rejected the bank's argument that Chapter 12 did not allow debtors to use livestock sale proceeds as part of their plan by giving the bank a replacement lien on future livestock and a new mortgage on land. *Id.* at 949–50.

The court acknowledged that several courts had strictly enforced the lien retention requirement of § 1225(a)(5)(B)(i), and its counterpart in Chapter 13, § 1325(a)(5)(B)(i). *Id.* at 949.[10] However, the court observed "none of the ... decisions involved a debtor whose main source of income was a livestock operation." *Id.* Determining such to be a distinguishing factor, the court reasoned that if the statute were given a literal reading, no livestock rancher would be able to obtain confirmation of a Chapter 12 plan:

> [I]f Debtors in the livestock business are required to use the entire proceeds of all their livestock sold on an annual basis to be applied to the creditor holding the livestock as security, there would be no funds available to pay the Debtors' remaining creditors, operating expenses, or living expenses.

*Id.* (citing *In re Hansen,* 77 B.R. 722, 726 (Bankr.D.N.D.1987)). The court observed that the plain meaning of the Code should be conclusive except in rare cases in which a literal application of the statute would produce a result demonstrably at odds with the intention of its drafters. *Id.* at 950 (citing *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989)). The court then concluded that "[w]e do not believe that by using the language 'the lien,' Congress intended to preclude livestock operations from obtaining confirmation of a Chapter 12 plan absent the consent of the creditor whose claim is secured by the livestock." *Id.* at 950. Since the plan provided that the bank retain its lien on "the herd," the court was convinced debtors had satisfied the "retain the lien" requirements of § 1225(a)(5)(B)(i), even though the debtors could spend any livestock sale proceeds to fund their operation and to pay other creditors. *Id.*

There can be no doubt that Chapter 12 was adopted to allow family farmers to reorganize. Having so acknowledged, the Court cannot assume that Congress did not mean what it said when it required that secured creditors retain their liens as a condition of confirmation of a Chapter 12 plan. The court's decision in *Hanna* can be read as applicable exclusively to livestock cases, since that was the basis offered by the court for deviating from the plain meaning of § 1225(a)(5)(B)(i). *Id.* at 950.[11] The Court could decide here that because Debtors grow crops, and do not raise livestock, *Hanna* need not be considered persuasive, and that a strict reading of the Code is in order. Surely, though,

---

**10.** Supporting a strict interpretation of § 1225(a)(5)(B)(i), the court cited *In re Butler,* 97 B.R. 508, 511 (Bankr.E.D.Ark.1988); *In re Batchelor,* 97 B.R. 993, 995 (Bankr.E.D.Ark. 1988); *In re Hochmuth Farms, Inc.,* 79 B.R. 266, 269 (Bankr.D.Md.1987); *In re Rott,* 73 B.R. 366, 374 (Bankr.D.N.D.1987); and *In re Citrowske,* 72 B.R. 613, 616 (Bankr.D.Minn. 1987). Supporting a strict interpretation of § 1325(a)(5)(B)(i), the court cited *In re Hink,* 81 B.R. 489, 491 (Bankr.W.D.Ark.1987); *In re Litton,* 36 B.R. 660, 661 (Bankr.M.D.Tenn. 1984); and also *Justice v. Valley Nat'l Bank,* 849 F.2d 1078, 1083 (8th Cir.1988).

**11.** The Court could assume Congress did not intend § 1225(a)(5)(B)(i) to be read strictly as to sugar beet farmers because there is nothing in the legislative history to suggest such; because none of the case law applying the statute literally involved beet farmers; and because if applied strictly, it would pose a real problem to beet farmers in reorganizing under Chapter 12. The Court could then conclude that since Creditor is to receive a continuing lien in Debtors' "crops," even though its lien in existing crop proceeds will be exhausted through Debtors' use of the money, such is sufficient for confirmation purposes. While the *Hanna* court was apparently satisfied with that approach, this Court seriously doubts Congress intended that different Chapter 12 confirmation standards be applied based solely upon the nature of a debtor's farming operation in each case.

distinguishing *Hanna* solely on its facts would be disingenuous.

The Court respectfully disagrees with the Eighth Circuit when it reasons that livestock operations are unique to agriculture in the manner in which they generate operating income, and that such constitutes an adequate basis for distinction in interpreting § 1225(a)(5). The debtors in *Hanna* sold their calves each spring, using the money to fund their operation the rest of the year. Here, Debtors raise and sell their crops in the fall and winter, and use those funds to operate. There is no real factual basis to differentiate between the debtors in *Hanna* and Debtors in this case. In truth, most all family farmers rely upon periodic income from their farming operation to survive and succeed. Only the duration of the respective income/expense cycle differs from farmer to farmer

Moreover, this Court does not consider it "absurd" for Congress to require that under the Chapter 12 of the Bankruptcy Code to achieve confirmation of a plan, unlike under Chapter 11, a debtor must propose that a dissenting secured creditor that is not receiving a return of its collateral "retain the lien securing such claim." The courts should not attempt to overrule Congress' decision because it has favored secured creditors over Chapter 12 debtors in those cases where the debtors propose to use cash collateral as part of their plans. Debtors could have elected the more liberal confirmation standards designed for Chapter 11 plans as noted above. Debtors presumably decided that the many advantages of Chapter 12 outweighed the relief available to them under Chapter 11.[12]

While Debtors' plan treatment of Creditor's secured claim is vague, it certainly does not propose that Creditor retain its lien on the cash proceeds from Debtors' crop sales until Creditor's secured claim is paid in full. Instead, confirmation of the plan would allow Debtors to consume much of Creditor's collateral in their operation, while restricting Creditor to its pre-bankruptcy lien rights for protection. While the Court's construction of the Code may severely impact Debtors' options for reorganization under Chapter 12, the Court prefers to read the Bankruptcy Code plainly, and concludes Debtors' approach violates § 1225(a)(5)(B)(i). If, as a matter of policy, the operation of this Code provision frustrates the purpose of Chapter 12, only Congress can make the necessary change in the law. Though Chapter 12 debtors have access to § 363(e) to use cash collateral preconfirmation, the confirmation standards do not allow such a practice absent the affected creditor's consent.

### 3. Plan Feasibility.

As indicated above, the Court was not given an adequate record from which it could fix the amount of Creditor's allowed secured claim. In addition, the Court has determined that, as proposed, Debtors' plan violates § 1225(a)(5)(B)(i) in the manner in which it treats Creditor's allowed secured claim. Obviously, confirmation of Debtors' plan must be denied.

However, the Court is not convinced Debtors will be unable to propose a confirmable plan in light of the Court's decision. Since the Court intends to allow Debtors one more opportunity to offer a Chapter 12 plan for confirmation, it may be helpful for the Court to briefly address the argument made by Creditor that Debtors' plan is not feasible as required by

---

**12.** Again, the Court recalls that Debtors commenced this case under Chapter 11, then moved to convert it to a Chapter 12 case several weeks later. *See* Debtors' Motion to Convert from a Chapter 11 to a Chapter 12 Proceeding [sic], Docket No. 21.

§ 1225(a)(6). In doing so, perhaps further litigation may be avoided.

■ To be confirmed, Debtors must show that they "will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6). Debtors bear the burden of proving their plan is feasible. *In re Perez,* 30 F.3d 1209, 1214 n. 5 (9th Cir.1994); *In re Ames,* 973 F.2d 849, 851–52 (10th Cir.1992). The Ninth Circuit B.A.P. has discussed § 1225(a)(6):

> Under this subsection, "[t]he debtor is not required to guarantee the ultimate success of his plan, but only to provide a reasonable assurance that the plan can be effectuated." *In re Hopwood,* 124 B.R. 82, 86 (E.D.Mo.1991). However, this reasonable assurance must rise above "bare agronomic feasibility." *In re Crowley,* 85 B.R. 76, 79 (W.D.Wis. 1988). The *Crowley* court stated that [s]uch a technical agronomical feasibility determination generally includes a variety of assumptions and the likelihood that these assumptions will occur must be determined by the Court .... Because past behavior and productivity are excellent indicators of future productivity, courts have frequently rejected plans which are premised on highly optimistic projections of increased production.

*Miller v. Nauman (In re Nauman),* 213 B.R. 355, 358 (9th Cir. BAP 1997). This Court has adopted a similar standard for proof of feasibility. *See, e.g., In re McIntyre,* 95 I.B.C.R. 202, 206 (Bankr.D.Idaho 1995).

In this case, Creditor indicts Debtors' attempts to show their future operation can be successful based upon their failures in past years. Of course, Debtors suffered through the OUST problem in the years immediately preceding filing this case. However, Creditor points out in its brief that Debtors' production and income projections also fell woefully short during 2002. Mem. in Opposition to Confirmation at 2, Docket No. 72. Debtors' response through the testimony of Mr. Stallings suggests that because of the delay in getting authorization to use cash collateral last spring, Debtors were very late in planting their crops. Cool weather in the spring, followed by extremely hot weather in the fall, impaired Debtors' production. Debtors concede, however, their total income from 2002 crops and government payments was about $226,000 lower than they projected.

■ Clearly, Debtors' historical yields constitute the best evidence of the reliability of their plan's projection of production. In light of the rehabilitative purposes of Chapter 12, in assessing the feasibility of Debtors' future operations, the Court will consider any appropriate factual basis to explain why Debtors failed to meet those historical levels of production in given years. For example, the fact that Debtors' crop land was poisoned with OUST, or that they could not wrestle Creditor's cash collateral away from Creditor in time to plant, are both legitimate explanations for deviations from expected production levels in the Court's opinion.

■ However, farming is fraught with inherent risks and difficulties. Debtors may be disappointed with the weather, the markets, or changes in government policies. Because of this, Debtors cannot expect to experience ideal production conditions throughout each year of their plan. While Debtors' proposed plan need not anticipate a major crop failure, to give meaning to § 1225(a)(6), the Court will require that Debtors' estimates be appropriately conservative based upon past years to account for those obstacles to optimum yields that always seem to occur to one degree or another in farming. In

other words, if Debtors' historical production of sugar beets under normal circumstances averaged from twenty tons per acre to twenty-five tons per acre over the years, to be credible, Debtors' Chapter 12 plan budget should probably rely upon projections in the lower end of that range, not the higher. A plan that relies upon only the best growing and market conditions may succeed in the short term, but is surely not a feasible approach to an effective reorganization.

More guidance concerning the Court's application of feasibility requirements pursuant to § 1225(a)(6) cannot be provided in the absence of a proposed plan.

## IV. Conclusion.

For all the reasons explained above, Debtors' proposed plan cannot be confirmed. Debtors failed to show their plan pays Creditor an amount equal to its allowed secured claim because the Court is unable to, on the present record, fix the amount of that secured claim. The BLM disaster payment does not constitute property of Debtors' bankruptcy estate, and Creditor's security interest is not enforceable against those funds. Debtors' proposed plan violates the "retain the lien" requirements under the plain meaning of § 1225(a)(5)(B)(i). Finally, any feasibility determinations must await the filing of an amended plan.

By separate order, confirmation of Debtors' Second Amended Plan and Supplement will be denied. Debtors will be allowed a brief opportunity to file a further amended plan in light of the Court's decision.